# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 4, 2012

## JARVIS Q. WILLIAMS v. STATE OF TENNESSEE

**Appeal from the Criminal Court of Shelby County**
**No. 01-08323     Chris Craft, Judge**

---

**No. W2012-00052-CCA-R3-PC  - Filed December 27, 2012**

---

Jarvis Q. Williams ("the Petitioner") filed for post-conviction relief from his convictions of seven counts of especially aggravated kidnapping and four counts of aggravated robbery, alleging ineffective assistance of trial and appellate counsel and denial of a public trial. After a hearing, the post-conviction court granted relief in the form of a reduced sentence but otherwise denied relief. This appeal followed. Upon our thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Joseph S. Ozment (on appeal), Memphis, Tennessee; Ryan Feeney (at hearing), Selmer, Tennessee, and Larry Copeland (at hearing), Memphis, Tennessee, for appellant, Jarvis Q. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Chris West, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

*Trial*

A jury convicted the Petitioner of seven counts of especially aggravated kidnapping and four counts of aggravated robbery for crimes committed in January 2001. The trial court

sentenced the Petitioner to an effective term of 360 years for these crimes. This Court affirmed the Petitioner's convictions and sentences on direct appeal. See State v. Jarvis Williams, No. W2002-03010-CCA-R3-CD, 2003 WL 23100810, at *9 (Tenn. Crim. App. Dec. 23, 2003). The Tennessee Supreme Court denied review on May 10, 2004. See id. at *1. To assist in the resolution of this proceeding, we repeat here the summary of the facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

Kimberly Hancock testified that, on the night of January 11, 2001, she was with her fiancee, Divin Wright, Divin's mother, Divin's step-father Jerome Carpenter, and Jerome Carpenter's brother, Omar Coleman. Kimberly wanted to retrieve some clothes that were at the home of her girlfriend, Marion Vaughn. Omar agreed to drive her to Marion's home, and Divin accompanied them.

When they arrived, Kimberly and Divin went into the house; Omar waited in the car. In the house were Marion, the Defendants John and Jarvis Williams,[1] Torrez Talley and Thaddeus Brown. Kimberly went upstairs and began to gather her clothes. She heard Defendant John coming up the stairs and heard him say, "somebody is fixing to die." Kimberly tried to run, but Defendant John grabbed her by the neck and threw her down the stairs. He followed her down and forced her to sit on the couch. Defendant Jarvis then forced Divin to sit on the couch next to her. Both Defendants were armed.

Defendant John accused Kimberly of having set up a break-in of his home by Divin's brother Oliver. Kimberly denied any knowledge of any break-in. Defendant John and Defendant Jarvis both told her that she was going to die because of her participation in the break-in. They also told Divin that he would pay for his brother's actions.

Torrez Talley and Thaddeus Brown left the house and returned with Omar. They made him strip and took his checkbook. Javon Bryant then arrived, pulling two guns and pointing one of them at Kimberly. Javon told Kimberly that she was going to help them find Oliver, and Javon and Defendant Jarvis forced Kimberly into a black car. Defendant Jarvis sat in the back seat with her and kept a gun on her. Javon Bryant drove.

---

[1] At times we will differentiate between the two Defendants by referring to them by their first names only.

Eventually, Defendant Jarvis called Oliver and arranged a meeting. Defendant Jarvis then called Defendant John and told him about the meeting. Javon Bryant then drove to the meeting place and forced Kimberly at gunpoint into Defendant Jarvis' purple Dodge Intrepid, which had been driven to the meeting place by Thaddeus Brown. Defendant Jarvis, Javon Bryant, Thaddeus Brown and Keith Ezell got in the car with her; Ezell was also armed. After a short time, Bryant and Ezell left the car and patrolled the area. When Oliver pulled up for the meeting, Bryant and Ezell got on either side of Oliver's car and told the two men in the car to get out.

In the car with Oliver were Jerome Carpenter, Oliver's fiancee Tonyell Somerall, and Tonyell's seven-year-old son, Jodeci. Oliver and Jerome were forced out of the car and told to strip. Javon Bryant hit Oliver in the head with a gun. Oliver was then forced into the trunk of the Intrepid, and Jerome was forced into the trunk of the car that Oliver had been driving, a Neon. Ezell took the wheel of the Neon, in which Tonyell and her son were still seated. Bryant returned to the Intrepid. Both cars then left the scene.

A short time later, both cars pulled over. Defendant Jarvis told Ezell to get Tonyell's identification and let her go. They got Jerome out of the Neon's trunk and placed him in the Intrepid's trunk with Oliver. They told Kimberly that they were going to let her go, but that they were going to kill Omar and Divin. They threatened to kill Kimberly and her daughter if she told the police. The men then dropped Kimberly off near her mother's house. She subsequently called the police. She testified that she was robbed of $120 that night by her assailants.

Divin Wright also testified. He explained that Oliver is his older brother. He stated that, when he entered Marion Vaughn's house, he saw both Defendants; Defendant John was Marion's boyfriend. Thaddeus Brown and Torrez Talley were also there. As Divin waited for Kimberly to gather her clothes, he saw Defendant John follow her upstairs. Kimberly then came "tumbling down" the stairs, and Defendant Jarvis grabbed Divin and "slammed [him] to the floor." Defendant Jarvis then forced him onto the couch while Defendant John forced Kimberly onto the other end of the couch. Both Defendants were pointing guns at Divin and Kimberly. The Defendants kept asking where Oliver was. Defendant John told Divin that they were going to kill him, Divin. Javon Bryant arrived and pointed two guns at them and asked Defendants John and Jarvis which one they wanted him to kill first. Divin

testified, "It was like Jarvis and [John] were the leaders." Eventually, Defendant Jarvis "put the gun on" Kimberly and forced her out of the house.

Before he left with Kimberly, Defendant Jarvis went outside and returned with Omar. Omar was forced onto the couch with Divin. After Defendant Jarvis and Javon left, Defendant John held a pistol on Divin and forced him to give him everything in Divin's pockets. Keith Ezell then entered, wielding a shotgun. Ezell began beating Divin. Defendant Jarvis stripped Divin naked; Omar was also stripped. At some point Oliver and Jerome were brought into the house, also naked. Divin testified that both Defendants beat on him with their guns and fists. They also kicked him. Divin saw the assailants beat his brother Oliver as well. Defendants John and Jarvis picked Divin up off of the floor at one point and forced his head into the smoldering fireplace. Defendants John and Jarvis poured bleach on Divin and the other three victims. Eventually, Defendants John and Jarvis, together with Javon Bryant, Keith Ezell, Torrez Talley and Thaddeus Brown, forced Divin into the trunk of a car and told him that they were going to take him and his brother to Mississippi and bury them. Divin was having trouble maintaining consciousness, and the next thing he remembered was leaving the hospital.

Omar Coleman testified that he drove Kimberly and Divin to Kimberly's friend's house on the night in question. Kimberly and Divin went into the house, and he remained in the car. After about ten minutes, three men approached the car with guns and told him that he was "under arrest." Omar identified Defendant Jarvis as one of the armed men. The men forced Omar into the house, where Omar saw Kimberly and Divin on the sofa. He also saw Defendant John in the house. Defendant Jarvis told him to remove his clothes. Omar testified that, "before I could even take them off [Defendant Jarvis] just started ripping them off and kicking me in my side." After Omar was stripped, he was told to sit on the couch while his pants pockets were shaken empty. Defendant Jarvis and Defendant John were asking, "Where's my stuff?" and Omar saw Defendant Jarvis grab some of the money that fell out of his pants.

While he sat on the couch, Omar heard Divin and Kimberly being asked about Oliver's whereabouts. Defendant Jarvis then accompanied Kimberly out of the house for the purpose of calling Oliver from a pay phone. Omar testified that Defendant Jarvis was armed as he took Kimberly out of the house. After Defendant Jarvis left, Defendant John made some phone calls, and some other men arrived at the house. These men were armed.

Eventually, Jerome and Oliver were brought into the house. Jerome and Oliver were naked. The assailants, including the Defendants, forced the four victims to lay on the floor. Omar then saw the assailants beating Divin and Oliver. Omar was struck once in the head when he tried to escape. After the beatings, the assailants poured bleach on the victims. Omar and Jerome were then forced out of the house and into the trunk of Omar's Ford Focus. Defendant John was one of the men who forced Omar into the trunk, and was armed while doing so. Oliver and Divin were forced into another car. Omar testified that one of the other assailants, a man he knew as Red Von,[2] told them that they were going to be driven to Mississippi and buried there.

Tonyell Somerville, Oliver's fiancee, testified that she and Oliver and her son Jodeci were driving home from dinner on the night in question, and stopped to pick up Jerome. They then drove toward some destination of which she was unaware, because she dozed off. When she awoke, she saw several men surrounding the car. The men were armed and were yelling at them to get out of the car. Oliver and Jerome got out of the car; one of the men approached her as she sat in the front passenger seat and told her not to move. She saw the men striking Oliver in the head, and the men were telling Oliver and Jerome to remove their clothes. One of the armed men got into the back seat of the car with Tonyell's young son. She then saw the men put Oliver in the trunk of another car, an Intrepid.

Tonyell testified that she was held at gunpoint and was very afraid. One of the armed men got into the driver's seat and began driving away. This man had a sawed-off shotgun. Tonyell pled for her life and her child's life, and the man told her not to worry, that they were after Oliver. He asked her for money, and she gave him what she had in her purse. She also gave him a ring she was wearing. The man pulled the car over in an area with which she was not familiar and told her to get out with her son and start walking. She begged to keep her car because she did not know where she was. At this point, another man came up and told the driver to just get her identification, and then let her go with her car. She testified that she handed over her identification, and the man that had come up to the car told her, "Okay. We've got your ID. We have your address and your name. If you go to the cops and say anything then we will come back and kill you and your son." The men then removed something from her trunk; she did not know at the time what was in there. She

---

[2] Red Von was elsewhere identified as Javon Bryant.

then left and called the police at the first opportunity. Tonyell identified the Defendants as two of the men involved in her abduction.

Jodeci, Tonyell's son, also testified. He was seven at the time of the offenses, and eight when he testified. He stated that he saw Oliver being hit with a gun.

Oliver Wright testified that he and Tonyell and Jodeci and Jerome were in the car after dinner when he got a phone call from Defendant Jarvis. Defendant Jarvis told him that his car had broken down and asked Oliver to take him to an auto parts store for a battery. He recognized Defendant Jarvis' voice because he had known him for about a year. He drove to Defendant Jarvis' location and recognized the purple Intrepid; the hood was up. He got out of his car and began to approach Defendant Jarvis' car when he saw Defendant Jarvis and two other men named Javon and Keith Ezell "jump around the corner with guns." The men told him, "Don't move or, bitch, you're going to die." Javon then told him to "get naked" and hit him in the head with a pistol. After he was naked, Javon hit him in the head again with the pistol, and he and Defendant Jarvis forced him into the Intrepid's trunk at gunpoint. Javon broke Oliver's leg with the trunk lid. The car was then driven a few blocks and stopped. At that point, Defendant Jarvis and Javon opened the trunk and placed Jerome in the trunk with him. Jerome was also naked. They drove for another few minutes and stopped at Marion Vaughn's house, where the trunk was opened by Defendant Jarvis and Javon. The men told Oliver and Jerome to get out; both men were armed as were two other men near the car. The four assailants took the two victims into the house, where Oliver saw Divin and Omar, both naked. Defendant John, who was in the house, walked up to Oliver and hit him in the head with a pistol. Subsequently, Defendant Jarvis, Javon, Defendant John, Thaddeus and Ezell all beat him; he also saw them hitting Divin in the head with pistols. The men told Oliver that he was "going to die" that night. Oliver testified that they "put cigarettes out" on his back and poured bleach on him and the other victims. The four victims were then forced back outside and put into the trunks of the Intrepid and Focus. Oliver heard Defendant Jarvis' and Javon's voices in the Intrepid. The car was driven off and stopped at a place where Oliver could hear a train approaching. The police then arrived and let the victims out of the car trunks.

Oliver testified that he suffered various injuries from the attack, including a broken leg, broken ribs and burns on his back. He also testified that his assailants took some money and jewelry from him.

Both Defendants testified. Defendant John Williams testified that he "wasn't involved in none of these incidents" and had been "at home with [his] child and [the] baby's momma." Defendant Jarvis Williams testified that he had "no knowledge of what's going on" and had "no idea what this arises from."

Id. at *1-4.

*Post-Conviction*

On March 18, 2005, the Petitioner, acting pro se, filed for post-conviction relief. The Petitioner subsequently was appointed counsel, who filed an amended petition. A hearing was held in April 2007, at which the following proof was adduced:

The Petitioner testified that, after trial counsel was appointed for him, they began discussing whether he had an alibi defense to the crimes with which he had been charged. He stated that he told his lawyer ("Trial Counsel") that he had been "at home that night." With him were his three children, ranging in age from one to six years old. His girlfriend, the children's mother, had left him at home to care for the children while she went to work. The Petitioner stated that he spent most of the evening on his computer. Trial Counsel did not seek to examine his computer. The Petitioner stated that he did not know if the computer was still in existence.

The Petitioner testified that Trial Counsel was "more adamant in pushing [him] into accepting a guilty plea" than investigating his case. Trial Counsel did not discuss the Petitioner's alibi with him nor did Trial Counsel send an investigator to discuss it with him. Trial Counsel did not ask for the Petitioner's girlfriend's phone numbers. When the Petitioner later questioned Trial Counsel about his failure to follow-up on the Petitioner's alibi, Trial Counsel told him that he did not believe "it was credible enough."

The Petitioner's first day of trial was on a Monday. Persons supporting the Petitioner attended the trial on that day through Wednesday. However, on Thursday, these persons were excluded from the courtroom. The Petitioner testified about this issue as follows:

No one ever gave us a complete answer [as to why these persons were excluded]. But we – it occurred during a recess. And Officer Bartlett was the

-7-

court officer at the time. And when we asked Officer Bartlett what was going on, his answer was, he really didn't know, but that someone had alleged that my co-defendant had flashed a gang sign. And that's what he pretty much said. So afterwards, [Trial Counsel] came back and I asked [him] what was going on, and he said he didn't know either.

The Petitioner denied that Trial Counsel had objected to the exclusion of these persons from the courtroom, in spite of his request that Trial Counsel address the trial court about it.

The Petitioner also complained that, in spite of their discussions, Trial Counsel did not seek to have the jury charged on the lesser-included offenses of especially aggravated kidnapping. The Petitioner also testified that, in spite of his request, his appellate lawyer ("Appellate Counsel") did not raise the lesser-included offense issue in his direct appeal.

On cross-examination, the Petitioner acknowledged that he told Appellate Counsel he did not want the issue concerning his right to a public trial included in his direct appeal. He also acknowledged that he understood his request to constitute a waiver of the issue. He also acknowledged that, when he testified on his own behalf at trial, he stated simply, "I had no knowledge of what's going on. And to my understanding, I have no idea what this arises from." He did not tell the jury that he had been home on the evening in question.

The Petitioner maintained that he did not recall the trial court charging the jury with aggravated kidnapping and kidnapping as lesser-included offenses of especially aggravated kidnapping, but he acknowledged that he might be mistaken if the transcript from the trial established that the trial court had charged them. He also acknowledged that he was not in the courtroom when the persons were excluded and that he did not know what happened regarding their exclusion.

On redirect examination, the Petitioner stated that, after asking Appellate Counsel not to raise certain issues, he then wrote her another letter and "asked that they go ahead and instead of not raising them to go ahead and raise them." He specifically requested that the public trial issue be raised.

On recross examination, the Petitioner acknowledged that this latter letter was written sometime after July 11, 2003.

Derrick Rucker testified that he attended the first part of the Petitioner's trial but was later "put out." He stated that no explanation was given, nor did the trial judge question him about activities that had been occurring in the courtroom. He stated that he did not threaten anyone in the courtroom or act disrespectfully to the trial court or the court officers.

Troy Hughlett testified that he attended the Petitioner's trial until he was told to leave and not return. He had been attending the trial in support of the Petitioner. He stated that the reasons for his exclusion were not explained to him. He stated that, while he was in the courtroom, he did not threaten anyone, flash gang signs at anyone, make any improper gestures to anyone, or act disrespectfully to the trial court or the court officers.

On cross-examination, Hughlett denied that he was a gang member. He acknowledged that was not aware of what everyone else was doing at the Petitioner's trial.

On redirect, Hughlett explained that two people were with him at the Petitioner's trial: Rucker and Hughlett's cousin Mario Winthrop. He stated that neither of them was a gang member. They sat together while attending the trial.

The State called Appellate Counsel to testify. She stated that, while she was preparing the Petitioner's direct appeal, she received several letters from him. She testified, "He was very articulate. Wrote good letters." She stated that she responded to each of the letters that she received from the Petitioner. She explained to him the difference between a direct appeal and a post-conviction proceeding, including the types of issues that were appropriate to each proceeding.

The motion for new trial included two issues: sufficiency of the evidence and sentencing. Appellate Counsel stated that she determined that the sentencing issue presented good grounds for appeal. She did not raise sufficiency of the evidence in the direct appeal because, given admissions by the Petitioner and one of his co-defendants, "there was really no way to legitimately question the identifications." When asked why she, nevertheless, did not raise sufficiency of the evidence on direct appeal, she stated, "I think that you weaken good arguments by making bad arguments to the Court when you've got a good one. And so, I chose not to challenge that, because in my judgment it was going nowhere."

When asked about the alleged expulsion of people from the trial, she testified:

I went back and checked the [trial] transcripts because it had not been mentioned by the trial lawyers, either one of them. Neither [Trial Counsel] nor [trial counsel for the Petitioner's co-defendant]. I read the transcript . . . . There were only about five or six lines in the transcript that dealt with it at all. And it appeared that what had happened is that during a recess or as they were breaking, someone in the audience made – either made faces, threw gang signs, did something. Which no one in the Court saw, but apparently [someone] reported it during the recess. And I don't even know who did. You couldn't tell from the record. It might have been the witness. That was the

way it sounded. Judge Dailey looked down into the courtroom and said, I don't see these young men here, but I'm not going to tolerate this kind of behavior. And said to the bailiff, if they try to come back in the room, kick them out. They're not welcome any longer. And that was the sum total of it. So apparently there's no mention in the record that they ever came back in. There's no – no indication that there was a dust up at the door or that the bailiff said anything to Judge Dailey. I spoke to both [co-defendant's counsel] and Trial Counsel. Neither of them remembered much about it. So I spoke to . . . the deputy on the door, very experienced courtroom deputy. And he didn't remember it. He didn't know anything about it. So it was just – there's not enough record to pursue it. There was nothing for the Court to do. These people were not in the courtroom when he said go away. And there's no indication that they ever tried to come back. And other than that, the courtroom was open the entire time to the public.

Accordingly, Appellate Counsel concluded that there was not enough proof to pursue this issue on direct appeal.

Appellate Counsel testified that, to the best of her recollection, the trial court charged the jury with lesser-included offenses, "down at least to robbery and simple kidnapping." Accordingly, she did not raise this issue on direct appeal.

The State next called Trial Counsel, who testified that he was appointed to represent the Petitioner at the Petitioner's arraignment. He discussed the charges with the Petitioner, discussed potential defenses, and provided the Petitioner with the discovery provided to him by the State. Initially, the Petitioner told him that, on the date and at the time in question, he had been "at somebody's house playing a video game and that he went to CK's Kitchen." This was "essentially" the same alibi provided by one of the Petitioner's co-defendants. Trial Counsel asked the Petitioner for witnesses as to his whereabouts, but the Petitioner did not provide any. The second time that Trial Counsel discussed the Petitioner's alibi defense, the Petitioner denied that he had an alibi.

As to his trial preparations, Trial Counsel testified that he reviewed the discovery and went over it with the Petitioner, had conferences with counsel for the co-defendants, filed motions, and prepared to cross-examine the State's witnesses. The Petitioner had not provided him with any witnesses. He averred that he was "as prepared as [he] could be" to go to trial.

Trial Counsel acknowledged that he moved to withdraw during trial. He explained:

When the State closed its proof, [the Petitioner] informed me that he was going to take the stand and that he was going to deny being there, being present. And I told him, look, you know, that's not what you told me all along. And if that's not the truth, I can't put you on and let you do that. He said, I don't care. I'm going to do it. And he insisted on doing it, as did his brother. And so we moved to withdraw.

The trial court did not grant his motion to withdraw.

Trial Counsel stated that the Petitioner did not wear civilian clothing during the trial because "[h]e just didn't have any." He added:

I always tell my clients they have a right to dress out and some want to. Some don't want to. Some can. Some can't. We have clothing up in the office that they can use if they choose to do so. Some people avail themselves of that, some don't. I don't recall what [the Petitioner] wanted to do in that regard. But I remember he didn't dress out.

When asked if he remembered "an occasion when [the trial judge] said that several individuals could not come back into court," Trial Counsel responded, "I don't have a clear recollection of it. But I do know it happened. That there was something raised. And – but I don't recall exactly what." He added, "I know [the trial judge] indicated that someone was not to come back in the courtroom." He denied that, at the time, he felt it was necessary to object. He later stated that he "got no complaint from" the Petitioner about this issue.

At the sentencing hearing, he argued against the enhancement of the Petitioner's sentences, but did not argue that the Supreme Court's opinion, Apprendi v. New Jersey, 530 U.S. 466 (2000), applied to prohibit the application of many of the enhancement factors utilized by the trial court. He also argued against consecutive sentencing. He subsequently filed a motion for new trial. He stated that he thought the evidence against the Petitioner "was overwhelming." Accordingly, he thought his strongest argument for direct appeal was on reducing the Petitioner's sentences.

On cross-examination, Trial Counsel stated that his trial strategy was to "[c]ross examine the witnesses." He stated that he did not present defense proof because "[t]here was no proof offered and [he] saw nothing to offer." He denied that the Petitioner had told him that someone was bringing him clothes to wear during the trial. He added,

-11-

If he had said that, we would have gotten him some clothes. He could have used the ones in the office. But I do not recall ever having a conversation with [the Petitioner] – well, I had a conversation with him about clothes. Because I offer everyone the opportunity to bring their clothes. But I do not remember any objection on his part or any indication that he had some on the way or that someone was trying to get him any.

He also stated that, had he been aware that someone was trying to get the Petitioner some clothes, he would have requested a continuance.

Trial Counsel testified that he "did not get an investigator to investigate the case" because he

was not offered anything to investigate. There was no identification issue. There was absolutely no issue after I talked with [the Petitioner] and he told me that all of this happened and the only reason he gave was that there was – you know, it was for revenge, for what happened to his brother.

He added, "My client told me he did it. The people he did it to knew him. . . . And I had statements from all the co-defendants that corroborated what had happened." Accordingly, an investigator would have been "futile."

The post-conviction court took the matter under advisement and later issued a comprehensive written order. The post-conviction court determined that the trial court committed constitutional error in its application of several enhancement factors to the Petitioner's sentences. Accordingly, the post-conviction court granted post-conviction relief to the extent of reducing the Petitioner's effective sentence to 275.5 years. The State has not appealed from this ruling. The post-conviction court denied relief as to all of the Petitioner's remaining allegations. On appeal, the Petitioner argues that he is entitled to post-conviction relief because Trial Counsel was ineffective in: failing to investigate the Petitioner's case; failing to request a continuance and/or the provision of civilian clothes in order to ensure that the Petitioner had civilian clothes to wear during his trial; and failing to deal effectively with the exclusion of persons from the courtroom, resulting in the denial of a public trial.

**Standard of Review**

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction

claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Analysis

*Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[3] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106,

---

[3] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

116 (Tenn. 2006) (quoting <u>Strickland</u>, 466 U.S. at 688)). Our Supreme Court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

<u>Baxter</u>, 523 S.W.2d at 934-35 (quoting <u>Beasley v. United States</u>, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." <u>Howell v. State</u>, 185 S.W.3d 319, 326 (Tenn. 2006) (citing <u>Strickland</u>, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" <u>State v. Honeycutt</u>, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting <u>Strickland</u>, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. <u>Rhoden v. State</u>, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." <u>Cooper v. State</u>, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." <u>Vaughn</u>, 202 S.W.3d at 116 (citing <u>Strickland</u>, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." <u>Pylant</u>, 263 S.W.3d at 869 (citing <u>State v. Burns</u>, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of <u>Strickland</u>." <u>Id.</u>

We turn now to the specific allegations of ineffective assistance of counsel raised by the Petitioner in his brief.

*Failure to Investigate*

Trial Counsel acknowledged that he did not hire an investigator in the Petitioner's case. He reviewed discovery provided by the State, including witness statements, and conferred with counsel for the Petitioner's co-defendants. Although the Petitioner initially told him that he had an alibi, Trial Counsel testified that the Petitioner subsequently admitted to his participation in the crimes. Accordingly, Trial Counsel's strategy at trial was to put the State to its burden of proof by cross-examining the State's witnesses. When he testified at his trial, the Petitioner did not claim an alibi.

After reviewing the proof adduced at the post-conviction hearing, the post-conviction court ruled on this issue as follows:

> It is apparent from a reading of the trial record that the proof against the petitioner and his co-defendant was overwhelming. His attorney testified that there was no proof to offer. The petitioner has presented no fact witness to the events of that night at the hearing on this petition that might have helped the petitioner, and has suggested no line of investigation or further communication with the petitioner or trial preparation which would have made a difference in the outcome of the trial. This allegation is without merit.

We agree with the post-conviction court. The Petitioner has failed to establish by clear and convincing evidence that Trial Counsel performed deficiently in declining to investigate further after the Petitioner admitted his participation in the crimes. Moreover, the Petitioner has failed to demonstrate that, even if Trial Counsel was deficient in this regard, the Petitioner was thereby prejudiced. The Petitioner offered no proof at the hearing of any exculpatory evidence that Trial Counsel should have found. Accordingly, the Petitioner is entitled to no relief on this basis.

*Trial Clothing*

The Petitioner contends in his brief that Trial Counsel "did not request any continuance to ensure that [he] had civilian clothing" and "made no efforts to [e]nsure [he] had civilian clothing." However, the Petitioner presented no proof that any friend or family member ever offered or tried to bring him civilian clothes. Trial Counsel testified that no clothes ever were brought, and he never was made aware that any were on the way. Thus, it is unclear why Trial Counsel should have moved for a continuance on this basis. Moreover, Trial Counsel testified that he would have provided civilian clothes to the Petitioner had the Petitioner asked for them. The Petitioner did not. The post-conviction court accredited Trial Counsel's testimony and found "without merit" the Petitioner's

allegation of deficient performance regarding the Petitioner's state of dress. We agree. The Petitioner is entitled to no relief on this basis.

*Exclusion of Persons from Courtroom*

Finally, the Petitioner contends that Trial Counsel was ineffective in not properly addressing and preserving an issue involving the alleged exclusion of three persons from the courtroom.[4] At the post-conviction hearing, the proof established that, during a recess in the trial, the trial judge concluded that three persons who already had left the courtroom had behaved inappropriately. Therefore, the trial court told one or more court officers that the individuals were not to be allowed to return to the courtroom.[5] The Petitioner testified that he learned about this event from one of the deputies, but he did not get a complete explanation. He asked Trial Counsel about it, but Trial Counsel did not know what had occurred, either. Trial Counsel testified at the post-conviction hearing that he had only a vague recollection about the event but acknowledged that he felt no need to object at the time.

Rucker and Hughlett each testified that he had been ejected from the courtroom and told not to return. However, the post-conviction court found as follows regarding these witnesses:

> as the record stands this court cannot even be sure that [Rucker and Hughlett] were ever even present at the trial. It is just as likely that these persons manufactured their testimony, or were present but were flashing threatening gang signs at the witnesses. No relationship with the petitioner was ever offered by the witnesses as a motive for their being present to support the petitioner at trial. Although no relationship need be shown for the petitioner to assert his right to a public trial, it would have been extremely helpful to this

---

[4] Although the Petitioner asserted in his petition for post-conviction relief as a distinct claim that his constitutional right to a public trial was violated, on appeal he addresses this issue only in the context of ineffective assistance of counsel.

[5] In its order disposing of the Petitioner's claim for post-conviction relief, the post-conviction court recited the following statement by the trial judge as "[t]he only indication in the trial record that this issue ever existed":

> All right. The three young men that were seated on this side of the courtroom early this morning. They're not in here now. They're not to be allowed back in the courtroom for the duration of the trial. We can't have the conduct that is threatening in any manner or suggests intimidation in any manner. And so if that continues they'll just be kicked out of the courtroom. It[']s as simple as that. Bring in the jury, please.

-16-

court in its job of assessing their credibility on the stand. One of them was brought to court from the county jail.

The post-conviction court also found that the Petitioner

failed to object to his attorney at the time, and that this failure to timely assert his right to have these three persons come back to the courtroom led to an almost nonexistent record, the absence of a hearing, and the impossibility for his trial and appellate attorneys to preserve this issue for the appellate record.

The post-conviction court concluded that the Petitioner was not entitled to relief on the basis of his claims on this issue.

We agree with the post-conviction court that the Petitioner has failed to establish that Trial Counsel provided ineffective assistance of counsel regarding this issue. The thrust of the Petitioner's argument is that, because Trial Counsel did not aggressively pursue the trial court's announcement that it intended to exclude persons from the courtroom, those persons, in fact, were excluded, thereby compromising the Petitioner's right to a public trial. The proof at the post-conviction hearing established that, after several persons left the courtroom, the trial judge announced his intention that they not be permitted to return. Appellate Counsel testified that her research revealed no attempts by these persons to return to the courtroom. The only proof in the record before us that persons actually were excluded from the Petitioner's trial is the testimony of Rucker and Hughlett. Obviously, the post-conviction court did not accredit the testimony of these individuals. The proof does not preponderate against the trial court's findings in this regard. Accordingly, the Petitioner is entitled to no relief on this issue.

## **Conclusion**

For the reasons set forth above, we affirm the judgment of the post-conviction court. This matter is remanded to the trial court for the amendment of the judgment orders to reflect the modified sentences ordered by the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE

-17-